# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# 3:07cv500-RJC-DCK

| | |
|---|---|
| TINA WORSLEY, Executrix of the Estate of Mark Worsley, Deceased, ) ) ) Plaintiff, ) ) v. ) ) AETNA LIFE INSURANCE COMPANY ) and DUKE ENERGY LONG-TERM ) DISABILITY INSURANCE PLAN, ) ) Defendants. ) ) | ORDER |

**THIS MATTER** is before the Court on the parties' cross motions for summary judgment (Doc. Nos. 43 and 46) and the plaintiff's motion for summary judgment on defendant Aetna's counterclaim (Doc. No. 50). For the reasons set forth below, the Court will **GRANT** the defendants' motion and **DENY** the plaintiff's motions.

## I. BACKGROUND

Plaintiff Mark Worsley[1] began work at Duke Energy as a line technician in 1979. The job required climbing power poles to repair outdoor, overhead electrical lines, and it is designated as a "heavy" physical demand level job. In November 1996, Worsley was injured in a motor vehicle accident when his car hit a deer.

After he recovered from the accident, Worsley returned to Duke Energy in 1997. He was first given a desk job, but he then returned to his previous position as a line technician. Worsley

---

[1] Unfortunately, Mark Worsley passed away while this motion was pending. The Court expresses its sincerest condolences to Mr. Worsley's family and friends. While Mark Worsley's wife Tina, as executrix of his estate, has been substituted as plaintiff in this action, for purposes of clarity, the Court retains the name Mark Worsley and the pronoun "he" throughout this Order when referring to the plaintiff.

passed an annual line technician physical for several more years while working in this position. He states that the Duke Power physician during this period cleared him to work as a line technician despite his taking the narcotic Methadone for pain, which should have disqualified him from the job. Then, when Duke Energy hired a new physician to conduct the annual physicals, Worsley was disqualified for the position as a line technician because he was taking prescription pain medications.

Worsley was given a job in dispatch, described as a "sit down" job. He then reported that his medications made him drowsy when he was not actively occupied at work. Worsley reported to his doctor that the decreased activity at the new position at times caused him to fall asleep at his desk. Problems with his supervisor and Aetna's inability to accommodate Worsley ultimately led to his leaving Duke Energy's employment in 2001. Worsley's final day of work at Duke Energy was April 8, 2001. Worsley filed a claim for long-term disability ("LTD") benefits in July 2001, and Duke initiated a claim with its LTD insurance carrier, Aetna, on his behalf.

By letter dated October 19, 2001, Aetna advised Worsley that he met the "usual occupation" definition of disability (that he was unable to work at his "usual occupation" as a line technician). Aetna thus approved his claim for LTD benefits, and he was eligible to receive LTD benefits beginning on October 12, 2001. Aetna explained to Worsley in the October 19, 2001, letter that after the first twenty-four months of disability (after October 12, 2003), he would need to meet the more stringent "any occupation" definition of disability to remain eligible for LTD benefits. The Summary Plan Description ("SPD") sets forth the "any occupation" definition of disability as follows:

> To be eligible to receive an LTD insurance benefit after receiving 24 months of disability payments, you must meet one of the following requirements (as determined by Aetna):

- Be unable to perform the essential functions of any occupation that you are reasonably suited to do through education, experience or training; or
- Be able to perform the essential functions of any reasonable occupation, but, while performing any occupation, your income is 80% or less of the amount you were earning before you became disabled.

(Doc. No. 41-6 at 28).

### A. Worsley's medical history prior to leaving Duke Energy's employment

Worsley has a history of physical pain, stemming from a shrapnel injury to his shoulder suffered in Vietnam in 1969 for which he underwent three surgeries, and orthopedic problems resulting in a 1983 cervical fusion of his neck vertebra. In 1996, the auto accident in which Worsley was involved left him in a coma for at least thirty days, with two toes on his left foot amputated, and with fractures of his clavicle, right leg, and several ribs.

In the years following the accident, while working again for Duke Energy, Worsley was treated by multiple physicians for various complaints of pain. His physical complaints after the accident involved arm numbness, cervicalgia (neck pain), and other chronic pain. In January 1998, Dr. Chewning, the orthopedic surgeon who had performed Worsley's 1983 cervical fusion,[2] noted lingering post-accident pain but no internal nerve damage and no present surgical options to alleviate pain. Dr. Chewning referred him to Dr. Neal Taub for treatment involving pain management and rehabilitation.

In May 1999, Worsley underwent a CT scan, which revealed a breakdown of the cervical fusions at the C3 to C4, C5 to C6, and C6 to C7 vertebrae.[3] Dr. Chewning recommended a second anterior cervical fusion from C3 to C7, and this surgery was conducted on August 12, 1999.

---

[2] A cervical fusion occurs when a vertebra of the neck is surgically fused to the adjacent vertebra.

[3] These cervical fusions presumably were all performed by Dr. Chewning in 1983.

3

Worsley reported a significant improvement during post-operation visits with Dr. Chewning. The office notes reflect that Worsley was "doing well" and that he reported the "pain is continuing to get better." (Doc. No. 40-6 at 76). Dr. Chewning further wrote, "When we review his job description I do not think that it is reasonable for him to ever return to this kind of work [as a line technician]. . . . Long term I believe he is [g]oing to be at light level/office type/information management type job." (Id.). Despite this prognosis, Duke's physician cleared Worsley to work as a line technician for a period.

> **B.     Worsley's symptoms after employment with Duke ended**

Worsley reported increased pain in his upper and lower extremities, including arm numbness, in April of 2001. He underwent an MRI of his spine on May 30, 2001, which found no significant neuron compressions, and the neurologic exam was normal. Dr. Mark B. Harman of Miller Orthopaedic explained to Worsley that he would continue to have the various symptoms he was experiencing, but that there was little more they could do at that time.

Dr. Taub treated Worsley throughout the period between April 2001 and Aetna's final claim determination in May 2006. The primary treatment offered by Dr. Taub was prescription pain medication including vicodin and methadone. Dr. Taub's 2001 and 2002 office notes indicate the prescribed medications caused Worsley occasional sedation or somnolence. Dr. Taub's notes from 2001 and 2003 show multiple occasions where Worsley reported reduced pain and that he was doing reasonably well overall. From 2003 through the termination of LTD benefits in 2006, Worsley's pain fluctuated, but there is only one mention of sedation or somnolence. The 2005 office notes do indicate better than 50% amelioration in pain. Further, Dr. Taub performed a nerve conduction study on February 22, 2006, and the results were within normal limits.

### C. Aetna's continuing investigation of Worsley's LTD Claim

Worsley worked at his cabinet-making business after leaving Duke Energy in April 2001. He was self-employed at this business throughout the disability period from April 2001 to May 2006 and reported that he worked four hours per day and that it represented his sole source of other income. Aetna discovered in May 2005, based on the pay stubs Worsley submitted, that his monthly salary may have increased from $500 to $700. Also in 2005, Dr. Taub reported after two consecutive office visits that Worsley "continues to note a greater than 50% amelioration of pain" and an "overall 30 to 50% average amelioration of pain." (Doc. No. 40-6 at 47, 48). These facts prompted Aetna to investigate whether Worsley had increased his hours at work and whether he continued to meet its definition of disability.

As a part of the investigation, Aetna requested that Dr. Taub and Worsley each complete questionnaires relating to Worsley's capabilities and physical condition. Dr. Taub reported on January 21, 2006, that Worsley was diagnosed with cervicalgia, noting that Worsley experienced chronic neck, back, and leg pain. He explained that Worsley's condition had worsened, and that he was "too impaired" to work and had "no ability to work" and was "incapable of minimal activity."

Aetna arranged for the surveillance of Worsley on January 31, February 2, and February 3, 2006, and Worsley was interviewed at his office on February 3, 2006. The surveillance revealed Worsley was at work more than eight hours per day, which he confirmed in the interview. Worsley, however, explained that his average work day included a significant amount of time spent sleeping in his office because his medications made him drowsy. (Doc. No. 40-6 at 42,43). He stated that some of his work activities included the following: inputting cabinet data from blueprints into a computer program, saving the data to disk, and transferring the disk to the workshop to be loaded

onto the router's computer so that the router could make precise cabinet or shelving pieces; and occasionally operating the forklift, but never lifting or carrying the boards.

Because Dr. Taub's description of Worsley's condition conflicted with the surveillance, Aetna sought clarification from Dr. Taub regarding his diagnosis. Aetna provided Dr. Taub with the surveillance video and Worsley's statements. On March 8, 2006, Dr. Taub explained in a letter that, to his knowledge, Worsley worked a maximum of approximately six hours per day at a sedentary level, and that he would continue to limit Worsley to this level of activity.

### D. April 26, 2006 Functional Capacity Evaluation ("FCE") and Transferable Skills Analysis ("TSA")

Aetna requested that Worsley partake in a FCE on April 26, 2006, because of the various discrepancies between Dr. Taub's reports, the surveillance video, and Worsley's self-reported work activities.

The FCE concluded that Worsley was capable of working full time at a medium level capacity. Looking then to Worsley's self-reported work activities and the FCE, Aetna conducted a TSA to determine whether there were other occupations for which Worsley was reasonably qualified. The TSA concluded that there were occupations for which Worsley was qualified and which he was able to perform, including warehouse supervisor and furniture assembly supervisor, among other positions. The TSA further noted that there were multiple potential employers for these other positions in the Charlotte, North Carolina area.

### E. Dr. Taub's revised restrictions and limitations

Aetna notified Dr. Taub in writing of the April 2006 FCE, explaining that it concluded Worsley could work full-time at a medium level. On May 9, 2006, Dr. Taub responded with the opinion that, in light of the FCE, Worsley could work at a medium level capacity, but that he still

recommended limiting Worsley to a maximum of six hours of work per day because of pain and the likelihood of increased pain with a full work day.

### F. Dr. Anfield's review and Aetna's termination of LTD benefits

On May 24, 2006, Aetna presented the conflicting evidence, including Dr. Taub's multiple reports, the surveillance, Worsley's self-reported work activities, the FCE, and the TSA to Dr. Anfield, Aetna's medical director. After reviewing the materials, Dr. Anfield concluded that Dr. Taub's final restrictions and limitations were speculative and that the restriction of six hours per day lacked objective support.

Aetna terminated Worsley's LTD benefits by letter dated May 24, 2006. On March 26, 2007, Worsley appealed the decision. The appeal letter included eighty-five pages of medical records, some of which had not been previously provided to Aetna.

### G. Dr. Sassoon's review of the record

Aetna sent Worsley's entire file to Dr. Eddie Sassoon, a physiatrist and pain management specialist, for a clinical functional impairment review. After reviewing the entire claim file, Dr. Sassoon initially reported that Worsley was capable of full time work at a sedentary, rather than a medium level. Correspondence between Aetna and Dr. Sassoon indicates that Dr. Sassoon may have confused terminology. In his initial report, Dr. Sassoon stated "I would feel that the claimant is able to perform in the sedentary functional level . . . on a full time basis." (Doc. No. 40-6 at 11). In the same report, however, Dr. Sassoon stated "it does not appear that the restrictions or limitations outlined by the treating provider [Dr. Taub] are appropriate based on the current documentation reviewed. (Id.).

Aetna sought clarification from Dr. Sassoon regarding his opinion as to the maximum functional capacity at which Worsley was capable of performing. Dr. Sassoon, after attempting

unsuccessfully to contact Dr. Taub for more information, clarified his opinion. He concluded that Worsley was capable of "medium functional activity with no further restriction or limitations other than medium functional limits of 50 pound lift . . . ." (Doc. No. 40-5 at 36). Dr. Sassoon added that "[t]here are no further updates beyond the day of the FCE including clinical findings indicating objective or functional impairments that would preclude medium level functional activity." (Id.).

### H.    Aetna's upholding of the termination of LTD benefits

In a letter dated June 6, 2007, Aetna upheld its termination of Worsley's LTD benefits. Aetna also informed Worsley that its decision in this regard was final, and of his rights under ERISA to file a civil action.

## II. LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the Record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677, 557 U.S. ___ (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. DISCUSSION

Courts review de novo a denial of benefits claim under § 1132(a)(1)(B) of ERISA, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). When such discretionary authority is vested in the administrator, the Court's review is limited to whether the administrator abused its discretion. Id. at 111; Bernstein v. Capital Care, 70 F.3d 783, 787 (4th Cir. 1995). Under an abuse of discretion standard, an administrator's decision "will not be disturbed if it is reasonable, even if this court would have come to a different conclusion independently." Ellis v. Metro. Life Ins. Co., 126 F.3d 228, 232 (4th Cir. 1997), abrogated on other grounds by Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S. Ct. 2343 (2008). When determining whether a decision was reasonable, a court may consider the following eight factors:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any

9

external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 359 (4th Cir. 2008) (quoting Booth v. Wal-Mart Stores, Inc., 201 F.3d 335, 342-43 (4th Cir. 2000)). The Booth factors are but a more particularized statement of the Court's basic inquiry: whether the decision was "the result of a deliberate, principled reasoning process" and "supported by substantial evidence." Brogan v. Holland, 105 F.3d 158, 161 (4th Cir. 1997). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion" and "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." LeFebre v. Westinghouse Elec. Corp., 747 F.2d 197, 208 (4th Cir. 1984).

### A. Applicable standard

Worsley argues that the benefit plan does not grant Aetna discretionary authority to determine eligibility for benefits or to construe the terms of the plan, and that a de novo standard of review should thus apply. He argues that the SPD is silent on Aetna's discretion, and that only the Group Policy and Administrative Information Booklet ("AIB") contain language granting such discretionary authority to Aetna. From here, Worsley asserts that since Aetna maintains that the SPD's terms control in the case of a conflict, and the SPD is allegedly silent on discretion, the Plan does not grant Aetna the discretionary authority that would trigger abuse of discretion review.

This argument fails. The Group Policy and AIB contain express grants of discretion to Aetna, and the SPD does not conflict with these express grants. Rather, the SPD contains multiple references to Aetna's authority to make benefit determinations, and these references are consistent with the grants of discretion in the Group Policy and AIB. For instance, the SPD states that eligibility for long term disability benefits are "determined by Aetna" and that benefits begin only

10

when "Aetna certifies that you are disabled."[4] The Court thus finds that no conflict exists between the SPD on the one hand, and the Group Policy and AIB on the other, regarding Aetna's discretion under the Plan.[5] The Court reviews Aetna's denial of benefits for abuse of discretion.

### B. Whether Aetna's termination of Worsley's benefits was reasonable

#### 1. the language of the plan

Worsley argues that the language of the plan does not support Aetna's determination. He points out that the Plan Documents, in defining disability, provide different percentages relative to a claimant's predisability income. The Group Policy definition quotes 70%, while the SPD quotes 80%. However, Worsley fails to show how this discrepancy affected Aetna's final determination in any way. Aetna applied the more favorable 80% figure from the SPD in its June 6, 2007, final denial of Worsley's appeal, which is the only claim determination at issue.

As the defendants point out, ERISA's pre-litigation exhaustion requirement is designed to uncover and address such procedural issues. See Makar v. Health Care Corp. of the Mid-Atlantic (Carefirst), 872 F.2d 80, 83 (4th Cir. 1988) ("By preventing premature interference with an employee benefit plan's remedial provisions, the exhaustion requirement enables plan fiduciaries to efficiently manage their funds; correct their errors; interpret plan provisions; and assemble a factual record which will assist a court in reviewing the fiduciaries' actions.") The exhaustion

---

[4] Were the overall LTD Plan to use such soft language, it would not confer discretionary authority. See Woods v. Prudential Ins. Co. of Am., 528 F.3d 320, 322 (4th Cir. 2008). The LTD Plan at issue here, however, expressly grants Aetna discretionary authority in both the Group Policy and AIB. Worsley points out that a grant of discretion in a summary plan description is insufficient to confer discretion on its own. While this statement is true, see id., it is inapplicable on these facts, as Aetna does not argue that the SPD confers it discretion. Rather, Aetna argues that the Group Policy and AIB expressly grant it discretion, and that the SPD does not conflict with the Group Policy's and AIB's express grant.

[5] Accordingly, since no conflict exists, the Court does not pass upon whether the SPD's purported silence should negate the express grants of discretion in the Group Policy and AIB.

11

requirement fulfilled this purpose in the instant action. The language of the plan does not indicate a lack of reasonableness on the part of the defendants.

> **2. the adequacy of the materials considered to make the decision and the degree to which they support it**

Worsley contends Aetna did not consider any evidence that he provided when it decided to terminate his LTD benefits. Rather, he argues, Aetna considered only three "self-serving" items: (1) the April 26, 2006, Functional Capacity Evaluation; (2) the reports of Dr. Edward Sassoon, Aetna's medical consultant; and (3) Aetna's Transferable Skills Analysis. Aetna maintains, as it did in its termination letter, that it reviewed the entire claim file in making the decision.

There is no evidence that Aetna's review was restricted to the three items Worsley suggests. Rather, the record is replete with other evidence considered by Aetna when it made the determination. This evidence includes objective materials such as the surveillance video of Worsley showing that he worked more than eight hours per day on the days he was observed. It further includes medical records, office notes, and opinions of treating physicians. Aetna certainly considered Worsley's treating physician Dr. Taub's opinion, as it followed up with Dr. Taub regarding the inconsistencies between the surveillance of Worsley and Dr. Taub's report that Worsley was "too impaired," "had no ability to work," and "cannot work at all."

Because the FCE results conflicted with Dr. Taub's diagnosis, Aetna provided the FCE report to Dr. Taub for comments. Dr. Taub responded by changing his diagnosis, agreeing that Worsley could work at a medium level, but concluding that he could not work more than six hours per day. Aetna discredited this new diagnosis because it was contradicted by the surveillance

footage, Worsley's own self-reports, an FCE, Dr. Anfield's review, and Dr. Sassoon's review.[6] As the Supreme Court has explained,

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).

The Court finds that the materials upon which Aetna based its decision were adequate, that they sufficiently support its position, and that they comprise "more than a mere scintilla of evidence" in favor of the determination. LeFebre, 747 F.2d at 208.

### 3. whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan

Aetna provided Worsley with LTD benefits between 2001 and 2006. Worsley argues that the termination of his LTD benefits during 2006 is inconsistent with the fact that Aetna provided him with LTD benefits for those roughly five years, and that Aetna ignored key evidence demonstrating his condition had worsened, rather than improved. Aetna maintains that its termination of Worsley's LTD benefits was consistent with its earlier provision of those benefits because Worsley's condition had improved by the time it terminated them. It points to objective evidence in support of this contention, including the April 26, 2006, FCE; the video surveillance; and Worsley's own 2006 self-reported work activities. Aetna further points to Worsley's treating

---

[6] Further, contrary to Worsley's contention that Dr. Sassoon did not consider the notes of Dr. Rapisardo, the record shows that Dr. Sassoon did review Dr. Rapisardo's notes, but he did not specifically comment upon them in his opinion. The Court will not speculate as to why he did not comment upon them. Dr. Rapisardo's notes do not detract from the significant objective evidence upon which Aetna based its decision.

13

physician's June and September 2005 office notes, which state that plaintiff self-reported a 30% to 50% amelioration in pain, and which prompted Aetna's decision to surveil Worsley.

The record contains sufficient "evidence which a reasoning mind would accept as sufficient" to support Aetna's conclusion that Worsley's condition had improved by the time it terminated his LTD benefits. LeFebre, 747 F.2d at 208.

### 4. whether the decision was consistent with the procedural and substantive requirements of ERISA

Worsley requested all documents relevant to his claim after Aetna terminated his LTD benefits. Despite this request, Aetna did not provide him with the documents it has designated as CF 000001 - 000582 until this litigation. These documents consist of Aetna's computerized notes, which contain information related to the TSA report and Aetna's consultation with Dr. Anfield.

Worsley contends this failure to produce relevant documents violated 29 C.F.R. § 2560.503-1(h)(2). However, he has failed to plead a violation of either § 2560.503-1(h)(2) or 29 U.S.C. § 1132(c)(1), which is the proper method for asserting such a claim. The Court will thus only consider Aetna's failure in this regard as a factor in determining whether Aetna abused its discretion.

The applicable Regulation states that ". . . the claims procedures of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures . . . [p]rovide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." 29 C.F.R. § 2560.503-1(h)(2)(iii). Aetna does not contest whether the documents in issue are relevant to Worsley's claim.

Aetna argues, however, that none of the documents in issue include information relevant to Worsley's claim that was not also included elsewhere in the documents Aetna provided him prior

to his appeal. After a painstaking review of the administrative record, the Court agrees. Worsley identifies the TSA report and the consultation with Dr. Anfield as the relevant information in the documents that he did not receive prior to his appeal. But as Aetna correctly demonstrates, the undisclosed information is consistent with information included in the termination letters Worsley received. For example, in the case of the TSA report, it appears that the previously undisclosed documents contain no more information than Worsley had already received in the documents designated as CF 000780-84 prior to his appeal. (Doc. No. 40-7 at 61-65).

As a result, if Aetna did violate § 2560.503-1(h)(2), such violation was not prejudicial. This factor does not weigh heavily in favor of either party.

### 5. the fiduciary's motives and any conflict of interest it may have

Aetna acknowledges that its dual role as both claim reviewer and claim payer may give rise to a potential conflict of interest. It maintains, however, that it has taken appropriate steps "to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances . . . ." Glenn, 128 S. Ct. at 2351. Worsley argues that there is no evidence in the Administrative Record that Aetna took any steps to temper this conflict, and that the Court should not review evidence outside the Administrative Record that Aetna has offered regarding the procedural safeguards it has instituted. Worsley further contends that Aetna's conflict of interest is heightened by its obligation to provide him with life insurance benefits as long as he is eligible for LTD benefits.

When reviewing a plan administrator's denial of benefits de novo, "[i]n the limited circumstance of a court's exercise of discretion with regard to the scope of review, consideration of the nature of the administrator or payor, particularly if they are the same entity, is appropriate. Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1026 (4th Cir. 1993). However, the Court

15

is aware of no Fourth Circuit precedent speaking to a district court's consideration of conflict-of-interest evidence outside the administrative record when reviewing a plan administrator's decision under a deferential standard of review, as the Court does here. A case from the First Circuit, however, is instructive as to this precise issue and set of facts. See Denmark v. Liberty Life Assur. Co. of Boston, 566 F.3d 1 (1st Cir. 2009). The court stated:

> ERISA benefit-denial cases typically are adjudicated on the record compiled before the plan administrator. Because full-blown discovery would reconfigure that record and distort judicial review, courts have permitted only modest, specifically targeted discovery in such cases. See Liston v. Unum Corp. Officer Sev. Plan, 330 F.3d 19, 23 (1st Cir. 2003) (noting that "some very good reason is needed to overcome the strong presumption that the record on review is limited to the record before the administrator").
> In some cases, a good reason has been found to exist when a party makes a colorable claim of bias. Targeted discovery addressed to such an issue may shed new light on the motivation behind the plan administrator's decision without expanding the panoply of materials on which that decision was based.
> The majority opinion in Glenn fairly can be read as contemplating some discovery on the issue of whether a structural conflict has morphed into an actual conflict. See, e.g., Glenn, 128 S. Ct. at 2351. . . . But any such discovery must be allowed sparingly and, if allowed at all, must be narrowly tailored so as to leave the substantive record essentially undisturbed.
> In future cases, plan administrators, aware of Glenn, can be expected as a matter of course to document the procedures used to prevent or mitigate the effect of structural conflicts. That information will be included in the administrative record and, thus, will be available to a reviewing court. . . .
> The case at hand falls into a special niche. Because the denial of benefits and the commencement of suit both predated Glenn, Liberty did not include in the administrative record any evidence with respect to its conflict-ameliorating procedures. Given these temporally awkward circumstances, we think that the district court, in its discretion, may wish to afford the parties a limited opportunity to flesh out the record (even if that entails further, appropriately circumscribed, discovery).

Id. at 10; see also Murphy v. Deloitte & Touche Grp. Ins. Plan, 619 F.3d 1151, 1161 (10th Cir. 2010) ("Our cases and the Supreme Court's decision in Glenn . . . contemplate that this general restriction [on evidence beyond the administrative record] does not conclusively prohibit a district court from considering extra-record materials related to an administrator's dual role conflict of

16

interest."); Johnson v. Conn. Gen. Life Ins. Co., 324 Fed. Appx. 459, 466-67 (6th Cir. 2009) (unpublished) (indicating Glenn is consistent with Sixth Circuit's prior case law allowing discovery related to dual role conflict of interest and procedural irregularities); Wilcox v. Wells Fargo & Co. Long Term Disability Plan, 287 Fed. Appx. 602, 603-04 (9th Cir. 2008) (unpublished) (instructing that Glenn permits "consideration of evidence outside of the administrative record to determine the appropriate weight to accord the conflict of interest factor").

The Court thus finds it appropriate to consider the very limited evidence presented by Aetna regarding the procedural safeguards it has implemented to ensure that its inherent structural conflict of interest does not lead to biased claim determinations. Both the Affidavit of Carole Roy and Aetna's answer in response to an interrogatory posed by Worsley make clear that Aetna has undertaken multiple steps to guard against potential bias. See (Doc. No. 44-1: Affidavit of Carole Roy; Doc. No. 54-1 at 6-8). While Worsley argues Aetna was biased in cherry-picking evidence in its favor when discontinuing his LTD benefits, there is ample evidence in the record that Aetna conducted a thorough review of Worsley's claim and reached a reasoned, unbiased determination. Aetna has provided sufficient evidence that its structural conflict of interest did not result in a biased claim determination.

## IV.    CONCLUSION

While there is certainly evidence favoring Worsley's position, this Court is not free to disturb an administrator's determination where it is reasonable, even if the Court "would have come to a different conclusion independently." Ellis, 126 F.3d at 232, abrogated on other grounds by Glenn, 554 U.S. 105 (2008). Aetna's decision was "the result of a deliberate, principled reasoning process" and "supported by substantial evidence." Brogan, 105 F.3d at 161.

**IT IS, THEREFORE, ORDERED** that:

1. the defendants' motion for summary judgment (Doc. No. 43) is **GRANTED**;

2. the plaintiff's motion for summary judgment on ERISA benefits (Doc. No. 46) is **DENIED**;

3. the plaintiff's motion for summary judgment as to Aetna's counterclaim (Doc. No. 50) is **DENIED as moot**; and

4. the plaintiff's case is **DISMISSED** as to both remaining defendants.

**SO ORDERED.**

Signed: January 25, 2011

Robert J. Conrad, Jr.
Chief United States District Judge